**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5080-15T4

LINWOOD AVENUE
DEVELOPMENT, LLC,

      Plaintiff-Appellant,

v.

ADVANCED PROFESSIONAL
PLUMBING, HEATING &
COOLING, LLC,

      Defendant-Respondent.

_____

Submitted July 3, 2018 – Decided April 25, 2019

Before Judges O'Connor and Moynihan.

On appeal from Superior Court of New Jersey, Law Division, Passaic County, Docket No. LT-001199-16.

Cavaliere & Cavaliere, PA, attorneys for appellant (Matthew J. Cavaliere, of counsel and on the brief).

Respondent has not filed a brief.

The opinion of the court was delivered by

O'CONNOR, J.A.D.

In this commercial tenancy action, plaintiff Linwood Ave Development, LLC leased property to defendant Advanced Professional Plumbing, Heating & Cooling, LLC. Plaintiff appeals from an April 22, 2016[1] order that, among other things, granted defendant an abatement in its rent and other relief. Plaintiff also appeals from a June 22, 2016 order denying its motion for reconsideration of the April 22, 2016 order. After reviewing the record and applicable legal principles, we reverse and remand for further proceedings.

I

The relevant facts are these. Plaintiff is the owner of an industrial building, referred to as the "Center." The Center contains four units. On December 31, 2014, the parties entered into a three-year lease agreement in which defendant agreed to lease one of the four units, specifically Unit 3. The lease commenced on February 1, 2015. Both parties were represented by counsel when they negotiated and executed the lease.

Under the lease terms, defendant was obligated to pay plaintiff $3100 per month in "base rent," which increased to $3193 per month on February 1,

---

[1] In its notice of appeal, plaintiff states it is appealing from an April 6, 2016 order. We assume plaintiff intended to state it is appealing from the April 22, 2016 order.

2016. The lease also compelled defendant to pay "additional rent," the details of which are unnecessary to recite.

Defendant did not pay the rent for January and February 2016. In February 2016, plaintiff filed a summary dispossess action in the Special Civil Part for non-payment of rent. Specifically, plaintiff sought the base rent for January and February 2016, as well as additional rent, late fees, and attorney's fees. Plaintiff also requested any additional rent that was to come due before the disposition of the summary dispossess action. In response, defendant requested a "Marini hearing," see Marini v. Ireland, 56 N.J. 130 (1970), asserting as a defense the premises lacked habitability and, thus, it was entitled to an abatement of the rent.

Before the hearing, defendant identified its specific claims of uninhabitability. They were: (1) a smell of vegetable oil emanated from Unit 4, an adjacent unit, which defendant found offensive; (2) vegetable oil from Unit 4 leaked into defendant's premises; (3) on occasion the roof leaked; and (4) the air-conditioning system did not work properly during the summer 2015.

At the conclusion of the Marini hearing, the trial court rejected defendant's claim the faulty air-conditioning system made defendant's premises uninhabitable, a finding defendant does not contest. However, the court made

A-5080-15T4

certain findings and ordered various remedies pertaining to defendant's other claims of uninhabitability, which plaintiff challenges on appeal.

The pertinent testimony provided at the Marini hearing was as follows. Daifallah Aljaloudi, defendant's owner and manager, testified defendant is in the business of providing plumbing and HVAC services. The premises defendant leased is approximately 4000 square feet; eighty percent is a warehouse facility and the remaining twenty percent is office space. Defendant primarily used the warehouse to stock inventory, such as boilers, water heaters, pipes, and other plumbing supplies.

Aljaloudi claimed that, commencing in March 2015, rain leaked through the roof on approximately eight occasions. Each time there was a leak Aljaloudi notified plaintiff's principal, Pasquale Dellacave, of the leak, who sent a roofer the following day. However, by the time the roofer arrived, the rain had stopped and water was no longer leaking through the roof. In most instances the roofer asserted there was no leak. Although he knew the first leak was in March 2015, Aljaloudi did not state when the other leaks occurred.

Aljaloudi acknowledged he was aware plaintiff was replacing the roof in sections throughout 2015, and that the roof was completely replaced as of

March 7, 2016. He conceded that before he entered the lease, plaintiff advised him that the roof might leak on occasion until it was replaced.

Aljaloudi testified the water that entered the roof through the leaks damaged a couple of the boilers in the warehouse, but he did not specify how. He mentioned other boilers may have been damaged, but he will not know if in fact they were until they are installed. He also stated that when it rained, the staff had to move or cover the inventory that was getting wet, but he did not articulate the time it took or the effort involved to undertake these measures.

Felix Clavico, the roofer who at plaintiff's request responded to defendant's premises when there was a complaint of a roof leak, testified he went to defendant's premises from March 2015 to December 2015 to fix leaks in the roof over the warehouse. He claimed he went to defendant's premises and fixed any leak he found the same day plaintiff contacted him to report a leak. Clavico characterized all of the leaks as "small." Clavico stated he went to defendant's premises twelve to fifteen times from March to December 2015, but on some of those occasions he was checking on work he had done the day before.

It is not disputed the entity that leases Unit 4 is in the business of recycling vegetable oil. Aljaloudi testified that on September 7, 2015,

February 23, 2016, and March 15, 2016, oil leaked from Unit 4 into Unit 3. Although not entirely clear, his testimony indicated the oil came through at the base of the wall that adjoins the two units, and that the leak always entered at the same spot. He claimed that he notified plaintiff of each leak on the day it occurred, but plaintiff never responded.

As for the impact of the oil leaks on defendant's business, Aljaloudi stated that each time there was an oil leak, his staff had to move some of the water heaters and boilers away from the oil on the floor. Also, it took two weeks for the oil on the floor to dry and, thereafter, the floor continued to be greasy. He also claimed that when the temperature outside reached eighty-five or ninety degrees, the smell from the oil was "nasty." He did not state how often between September 7, 2015 and March 15, 2016 the temperature actually reached such heights.

Mohammad Alhonsi, a principal of Delta Recycling (Delta), the business that recycled vegetable oil in Unit 4, testified the first oil leak into defendant's premises was caused by the failure to fully shut one of the valves on a tank in Unit 4 that stored vegetable oil. He admitted the oil leaked through the wall and onto a small portion of the floor in Unit 3, as well as on some pipes that were against the wall.

A-5080-15T4

Alhonsi testified Delta's staff cleaned up defendant's floor and pipes the same day as the leak, and was informed by defendant's staff that Delta had done so satisfactorily. Alhonsi provided defendant with Delta's insurance information so that defendant could file an insurance claim, but defendant declined, stating there was no need to file a claim given Delta had cleaned up the oil.

Alhonsi claims there were no other oil leaks. He testified the oil leak that defendant claimed occurred in September 2015 was not an oil but a water leak. As for the odor of oil, Alhonsi did admit that one of defendant's staff complained about the smell of the oil and that defendant wanted a "filter system" installed. Finally, Alhonsi stated Delta did not need a license or permit from the Department of Environmental Protection (DEP) to run its vegetable oil recycling business.

Plaintiff's principal, Dellacave, also testified. He stated he received only three complaints from defendant about leaks in the roof. He received a complaint in March, October, and December 2015. He asserted he sent a roofer out to the defendant's premises the same day he got a complaint. Dellacave stated the March 2015 roof leak was fixed within a week, and the

7

other two leaks were fixed within just a few days of receiving defendant's complaint.

As for oil leaks, Dellacave stated he received a complaint from defendant on only two occasions, one in September 2015 and the other in December 2015. He went to defendant's premises when he learned of the first leak. He noticed the oil was at the "dividing wall" between Units 3 and 4, toward the rear of the premises. The oil extended nine feet along and four feet out from the dividing wall. The oil was as deep as "a pencil to a trace." Dellacave testified that Delta's staff cleaned up the oil and, in his opinion, the job was satisfactory. One of defendant's employees stated defendant was not going to bother filing an insurance claim.

Dellacave also testified defendant reported another leak coming from Unit 4 in December 2015. Dellacave called a representative from Delta, who claimed there was no oil leak, that what defendant's employees observed was groundwater that had seeped through a crack in the floor of Unit 3. Dellacave inspected the area, agreed with Delta's assessment, and fixed the crack in the floor within a week. Dellacave claimed defendant did not complain about any other oil leaks. Finally, he noted the wall separating Unit 3 from Unit 4 is a

metal stub with two layers of sheetrock on each side of the stub, and that such wall was approved by the Building Department.

The trial court found as follows. With respect to the roof leaks, the court found defendant was "inconvenienced," but that the water "coming down . . . from the roof [was] not significant. It's water[,] . . . definitely an inconvenience to the tenant, but we're not talking about gallons upon gallons." The court further noted there was no evidence defendant sustained any property or other damages. However, despite these findings, the court determined that, because the roof was not replaced until March 2016, it was compelled to give defendant "a rent abatement for that."

As for the oil leak, the trial court observed Section 9 of the lease provides, among other things, that plaintiff warrants and represents there are no hazardous substances in any of the Units, and that plaintiff has been in compliance with all applicable environmental laws. Although the court credited the testimony that Delta had cleaned up the oil that had leaked into defendant's premises, the court expressed the opinion "it's never going to be 100 percent clean" and that what seeped into Unit 3 from Unit 4 was hazardous. We note the court found that the oil that leaked into Unit 3 affected only a part of the wall inside of that unit.

A-5080-15T4

The court also found Delta required a license from the DEP to operate, commenting "the reason why this is very critical is because . . . obviously there are serious environmental concerns. Because this is not clean oil. I mean, this is used oil that is now going [o]nto the floor of [Unit 3 and Unit 4]."

On April 22, 2016, the court entered an order stating defendant was entitled to an abatement in the rent owed to plaintiff, because of the water leaks and an "oil contamination issue." The court ordered defendant's rent abated in an amount equal to five percent of the base rent defendant owed for the months of January, February, March, and April 2016, as well as five percent of certain additional rent referenced in the order.

In addition, because in its opinion the oil that leaked into defendant's premises was a hazardous substance and "has a potential for health considerations," the court ordered plaintiff to do the following. First, plaintiff was ordered to install "an adequate barrier" between Unit 3 and Unit 4 to prevent additional occurrences of oil seepage from Unit 4 to Unit 3. Second, plaintiff was ordered to require Delta to obtain a DEP license or, if a license was not required, to obtain "confirmation from the DEP or applicable professional that no such license is required."

10

The order further provides that if plaintiff failed to comply with the aforementioned directives by July 6, 2016, defendant was entitled to an additional rent abatement of ten percent of the base rent and any additional rent due, which shall continue until plaintiff "shall cause such compliance."

Finally, because defendant was the prevailing party, the court denied plaintiff's request for late fees for the months of January, February, March and April 2016, and ordered each party was responsible for the payment of its respective counsel fees.

On June 22, 2016, the court entered an order denying plaintiff's motion for reconsideration of the April 22, 2016 order. This appeal ensued.

II

On appeal, plaintiff contends the court erred because: there was no evidence adduced during the Marini hearing to justify an abatement of defendant's rent; there was no evidence the oil that leaked into defendant's unit was a hazardous substance and, even if there were, a Marini hearing is not the appropriate proceeding to address such issue; plaintiff was entitled to late fees and attorney's fees; and a commercial tenant is not entitled to a Marini hearing.

We readily dispense with the last contention. When before the trial court, plaintiff stated it was not contesting defendant was entitled to a Marini

hearing. Moreover, the holding in Marini, 56 N.J. at 146-47, is equally applicable to commercial tenancies. Demirci v. Burns, 124 N.J. Super. 274, 276 (App. Div. 1973).

The scope of our review of a non-jury case is limited. Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011). The findings on which a trial court bases its decision will "not be disturbed unless 'they are so wholly insupportable as to result in a denial of justice[.]'" Rova Farms Resort, Inc. v. Inv's Ins. Co., 65 N.J. 474, 483-84 (1974) (quoting Greenfield v. Dusseault, 60 N.J. Super. 436, 444 (App. Div. 1960)). However, although a trial court's factual findings will not be overturned absent an abuse of discretion, questions of law are subject to de novo review. Balsamides v. Protameen Chems., Inc., 160 N.J. 352, 372 (1999).

In every lease for premises there is an implied warranty of habitability, which is a covenant that there are no latent defects in facilities vital to the use of the premises and that the premises shall be in usable condition during the term of the lease. Marini, 56 N.J. at 144. At one time the implied warranty of habitability applied only to residential premises but, as previously noted, this warranty has expanded to commercial facilities. Demirci, 124 N.J. Super. at 276.

"Habitability is synonymous with suitability for living purposes[.]" Aronsohn v. Mandara, 98 N.J. 92, 104 (1984) (citing Trentacost v. Brussel, 82 N.J. 214, 225 (1980)). The premises in question must be occupiable; for example, there must be sufficient heat, ventilation, light, plumbing, sanitation, security and maintenance. Ibid. "Not every defect or inconvenience will be deemed to constitute a breach of the covenant of habitability." Berzito v. Gambino, 63 N.J. 460, 469 (1973). The defect or problem "must be such as truly to render the premises uninhabitable in the eyes of a reasonable person." Ibid.

To guide courts in the determination of whether a condition rises to the level of breaching the warranty of habitability, the Berzito Court adopted a list of relevant factors for the court to consider. They are:

> 1. Has there been a violation of any applicable housing code or building or sanitary regulations?
>
> 2. Is the nature of the deficiency or defect such as to affect a vital facility?
>
> 3. What is its potential or actual effect upon safety and sanitation?
>
> 4. For what length of time has it persisted?
>
> 5. What is the age of the structure?
>
> 6. What is the amount of the rent?

13

7. Can the tenant be said to have waived the defect or be estopped to complain?

8. Was the tenant in any way responsible for the defective condition?

[Id. at 470.]

The Court held that these factors are "intended to be suggestive rather than exhaustive," and "[e]ach case must be governed by its own facts" so as to come to a result that is "just and fair to the landlord as well as the tenant." Ibid.

A tenant has three remedies for breach of the implied warranty of habitability. First, a tenant may "regard the breach as a constructive eviction and quit the premises without further liability to the landlord for rent." Drew v. Pullen, 172 N.J. Super. 570, 574 (App. Div. 1980). Second, a tenant may "give notice to the landlord of the defect and if the landlord fails to remedy the condition, the tenant himself may do so, deducting the reasonable cost of repair from his rent." Ibid.

Third, "[i]n an action by a landlord for unpaid rent[,] a tenant may plead, by way of defense and set off, a breach by the landlord of his continuing obligation to maintain an adequate standard of habitability." Berzito, 63 N.J. at 469. If the tenant proves the premises were uninhabitable, "the tenant will be charged only with the reasonable rental value of the property in its

imperfect condition during his period of occupancy." Ibid.; see also C.F. Seabrook Co. v. Beck, 174 N.J. Super. 577, 595 (App. Div. 1980) ("The tenant of a dwelling affected by serious defects which impair habitability must pay the reasonable rental value only."). Here, defendant availed itself of the third option – it sought an abatement in the rent as a defense to plaintiff's summary action for possession.

Summary dispossess actions are "statutory proceedings designed to accord landlords an expeditious and inexpensive means of regaining possession of leased premises as authorized by statute." Daoud v. Mohammad, 402 N.J. Super. 57, 58-59 (App. Div. 2008) (citing Hodges v. Sasil Corp., 189 N.J. 210, 220 (2007)). "One of several statutory grounds permitting a summary dispossess action is nonpayment of rent." Hodges, 189 N.J. at 221 (citing N.J.S.A. 2A:18-53(b)). "Consistent with the summary nature of the proceedings, our court rules do not permit the filing of an answer, a counterclaim or discovery proceedings [in summary dispossess actions]." Fargo Realty, Inc. v. Harris, 173 N.J. Super. 262, 267 (App. Div. 1980) (citing Rules 6:3-1, 6:3-4, and 6:4-3(a)).

Therefore, summary actions between a landlord and tenant for the recovery of premises may not be joined with any other cause of action. R. 6:3-

4. Further, in a summary dispossess action, a tenant cannot recover rent that has already been paid. C. F. Seabrook, 174 N.J. Super. at 589. An "allegation [in a summary dispossess action] that the premises were uninhabitable during unrelated periods of time is akin to a counterclaim" and counterclaims are not permitted in such actions. Fargo, 173 N.J. Super. at 267 (emphasis added). Finally, "tenants are not entitled to an abatement [of rent] when the landlord repairs the defective condition within a reasonable time after learning of its existence." Chess v. Muhammad, 179 N.J. Super. 75, 80 (App. Div. 1981).

Here, defendant did not file an action against plaintiff for breach of the warranty of habitability; plaintiff filed a summary dispossess action and defendant asserted the premises lacked habitability as a defense and requested a Marini hearing. Therefore, defendant's remedies are limited.

The court found as fact that the water leaks merely inconvenienced defendant. There is sufficient credible evidence to support that finding. Although the trial court did not consider the eight factors in Berzito, 63 N.J. at 470, in this instance such oversight was harmless, as there is a dearth of evidence the water leaks rendered the premises uninhabitable. According to Aljaloudi's testimony, at worst, the water leaks damaged only two boilers, and the nature or extent of that damage was not provided. Although the staff had

16

to move or cover some of the inventory, there was no evidence of the time or effort expended to accomplish such task. In short, there was no evidence the leaks made the premises uninhabitable. Berzito, 63 N.J. at 469.

Notwithstanding the lack of evidence the water leaks made the premises uninhabitable, the court found defendant entitled to an abatement of the rent it owed plaintiff for the months of January, February, March, and April 2016. There is no legal support for this finding. Defendant was not entitled to an abatement for the very reason the premises were not made uninhabitable by the leaks.

Further, plaintiff sought possession because defendant failed to pay rent from January to April 2016. There was no evidence of any water leak during the latter period, yet the court granted defendant an abatement in the rent it owed in January, February, March and April 2016. Defendant was not entitled to an abatement in rent for any month other than the ones in which the premises were uninhabitable. Berzito, 63 N.J. at 469; see also Seabrook, 174 N.J. Super. at 595. To the extent it found defendant entitled to the abatement for a water leak or leaks that occurred before January 2016, the court erred. In a summary proceeding, a tenant cannot recover rent that has already been paid. Seabrook, 174 N.J. Super. at 589.

A-5080-15T4

As for the oil leaks, defendant testified there was a leak in September 2015, and in February and March 2016. Plaintiff claimed there was only the one leak in September 2015. The court did not make a finding of fact about whether there was an oil leak in February and March 2016, in addition to September 2015. Be that as it may, there was no evidence the oil leak or leaks in this warehouse rendered the premises uninhabitable.

Aljaloudi did state the smell of the oil was "nasty" when the temperature reached eighty-five degrees and above, but he did not specify for how long the odor lasted after a leak or the extent to which the odor was detectable within the warehouse. That is, it was not clear whether the odor was confined to the area of the leak or extended beyond that area. Defendant's staff had to move some inventory away from the oil leak, but there is no evidence this was an arduous or time-consuming task. It is undisputed Delta informed defendant it would cooperate with defendant if defendant decided to file an insurance claim, but defendant declined to do so. In the final analysis, there is no evidence the oil leaks about which Aljaloudi testified affected the premises to the point where the warehouse could not be occupied. To have ordered defendant was entitled to an abatement of rent was error.

18

More important, the trial court did not have a basis in fact or at law to order plaintiff to install a barrier between Units 3 and 4, or to order plaintiff to require Delta to obtain a license from the DEP or obtain confirmation one is not required. First, there was no evidence the oil is a hazardous substance. Second, as noted, a hearing for summary possession is very limited. Such an action is designed to "accord landlords an expeditious and inexpensive means of regaining possession of leased premises[,]" see Daoud, 402 N.J. Super at 58 (citing Hodges, 189 N.J. at 222), when a tenant fails to pay rent.

A tenant may assert uninhabitability as a defense, but a summary action between a landlord and tenant for the recovery of premises may not be joined with any other cause of action. R. 6:3-4(a). In effect, the trial court handled this matter as if defendant had asserted a cause of action against plaintiff for permitting another tenant to a store hazardous substance in its premises, for which defendant sought injunctive relief. Such an action was neither initiated by defendant nor permitted in this summary proceeding, not to mention plaintiff did not have notice of the relief ultimately ordered. Accordingly, the April 22, 2016 and June 22, 2016 orders are reversed and the matter remanded so that a judgment of possession may be entered in favor of plaintiff. In

addition, in light of our disposition, the trial court shall determine whether plaintiff is entitled to late fees and attorney's fees.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5080-15T4